**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 12, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

AARON JAMES DUNN,

      Defendant-Appellant.

No. 15-1475
(D.C. No. 1:15-CR-00198-PAB-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH** and **O'BRIEN**, Circuit Judges.[**]
_____

In this case, Mr. Aaron Dunn appeals the district court's denial of his

motion to suppress evidence obtained in a search of his apartment. We

_____

[*]    This order and judgment does not constitute binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. But the order and judgment may be cited for its persuasive value under Fed. R. App. P. 32.1(a) and Tenth Cir. R. 32.1(A).

[**]    The Honorable Neil Gorsuch heard oral argument in this appeal, but has since been confirmed as an Associate Justice of the United States Supreme Court. He did not participate in the decision. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. *See* 28 U.S.C. § 46(d); *see also United States v. Wiles*, 106 F.3d 1516, 1516, at n* (10th Cir. 1997) (noting that this court allows remaining panel judges to act as a quorum to resolve an appeal). In this case, the two remaining panel members are in agreement.

conclude that the warrant lacked particularity and that the district court erred in overruling Mr. Dunn's motion to suppress.[1]

## I. Authorities obtain a warrant to search Mr. Dunn's apartment.

The search was conducted as part of an investigation involving a stabbing; the suspect was Mr. Leonard Martinez. Two days after the stabbing, the police traced Mr. Martinez to Mr. Dunn's apartment, where Mr. Martinez spent a short period of time. A warrant was obtained to search Mr. Dunn's apartment for evidence of the stabbing. During the search, officers found two firearms, which led to charges against Mr. Dunn for possession of a firearm after a felony conviction.

Mr. Dunn moved to suppress the firearms discovered during the search, arguing that the search warrant was invalid. The district court agreed but determined that the good-faith exception to the exclusionary rule applied.

We agree that the search warrant was invalid. In our view, however, the good-faith exception to the exclusionary rule does not apply.

## II. The warrant lacked particularity.

The particularity requirement originates in the Fourth Amendment, which states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to

---

[1] Mr. Dunn also contends that the district court should have granted the motion to suppress based on the absence of probable cause. We need not address this contention.

be searched, and the persons or things to be seized." U.S. Const. amend. IV. In our view, the particularity requirement was violated.

## A. Standard of Review

In reviewing the district court's ruling on particularity, we engage in de novo review. *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000).

## B. The particularity requirement was violated.

When deciding whether a warrant is sufficiently particular, we consider whether the warrant's description of the items to be searched would enable "the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006) (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)). The particularity requirement prevents overly general searches, ensuring that searches are confined to evidence relating to particular crimes in which there is probable cause. *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985).

### 1. Catch-all phrases can impermissibly widen the scope of warrants.

The warrant here listed particular items to be searched, but prefaced the list with a catch-all phrase, stating that the items to be searched "include but are not limited to" the listed items. A similar catch-all phrase was addressed in *Cassady v. Goering*, 567 F.3d 628 (10th Cir. 2009). There

3

we invalidated a warrant that listed items but contained a catch-all phrase authorizing officers to search for "all other evidence of criminal activity." *Cassady*, 567 F.3d at 635.

The warrant here is even broader than the one in *Cassady*. Unlike the warrant in *Cassady*, the warrant here includes items that do not necessarily constitute evidence or fruits of a crime. For example, when listing the purposes for the search, the warrant authorized a search not only for evidence involving the means of committing a crime, but also for the all-encompassing reason "other." In this way, the warrant effectively authorized a search of everything in the apartment for any reason. Under *Cassady*, the warrant lacks particularity.

**2. The specific catch-all phrase "not limited to" was used in Mr. Dunn's warrant.**

The warrant's catch-all provision contained the phrase "not limited to." This phrase does not always render a warrant defective. But it does so here.

**a. "Not limited to" language does not render the warrant sufficiently particular in our case.**

The government argues that we have upheld similar "not limited to" language and should do so again. For this argument, the government relies on *United States v. Sullivan*, 919 F.2d 1403 (10th Cir. 1990). In *Sullivan*, we upheld a warrant that included the phrase "not limited to." 919 F.2d at 1424 n.31. *Sullivan*, however, is distinguishable for two reasons.

4

First, there is no indication that the defendant in *Sullivan* challenged the "not limited to" language of the warrant, and the "not limited to" language is not discussed in the opinion. The phrase appears only in a footnote that quotes the warrant. Thus, *Sullivan* does not bear on this issue. *See United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 38 (1952) (stating that an opinion does not constitute binding precedent on a point that is not raised or decided).

Second, the "not limited to" language in *Sullivan* did not modify the entire list. Rather, the "not limited to" language modified only one category of items related to documents. Therefore, the *Sullivan* panel was not authorizing an unlimited search. In our case, however, the warrant authorized a search of everything in the apartment.

The qualifying phrase, "not limited to," is frequently included with particular categories in a warrant. In those situations, we have held that the "not limited to" language does not taint a warrant when the language serves only to modify one or more categories in the list. *See United States v. Burgess*, 576 F.3d 1078, 1091-92 (10th Cir. 2009) (warrant not tainted when the "not limited to" language applies only to a category of drug paraphernalia); *United States v. Otero*, 563 F.3d 1127, 1132-33 (10th Cir. 2009) (same with respect to categories of documents and computer files); *United States v. Pringle*, 53 F. App'x 65, 70 (10th Cir. 2002) (unpublished) (same with respect to a category of documents).

5

But here, the phrase "not limited to" is used in connection with the entire warrant, not just particular categories. Thus, the addition of this phrase allowed officers to search for any item for any reason. *See United States v. Bridges*, 344 F.3d 1010, 1017-18 (9th Cir. 2003) (holding that "not limited to" language that modifies the entire list of items on a warrant authorizes the seizure of any item, rendering the warrant insufficiently particular). Our case involves "not limited to" language that modifies the entire list of items. This language does not render the warrant sufficiently particular.

**b.** **The specificity of the listed items does not limit the scope of the catch-all phrase.**

The government also argues that the catch-all phrase is limited by the list of items. For this argument, the government does not provide any supporting authority.[2] In the absence of such support, we do not see how the specificity of the items would limit the scope of the catch-all phrase.

**3.** **The accompanying affidavit did not cure the lack of particularity in the warrant.**

The warrant was issued based on an affidavit signed by a law enforcement officer. The government contends that this affidavit supplies the required particularity.

---

[2] *Sullivan* does not support the government's argument. There the Court held that the warrant was sufficient, but the Court did not suggest that the sufficiency of the warrant was based on the presence of a list of items accompanying the catch-all phrase.

6

We reject this contention. Particularity in the affidavit can sometimes cure the defect in the warrant. *United States v. Leary*, 846 F.2d 592, 603 (10th Cir. 1988). But to cure the defect, the warrant and affidavit must be attached and the warrant must expressly incorporate the affidavit. *Id.*

Neither condition is present here. The government states that the warrant and affidavit were attached, but there is no evidence to support that statement. *See United States v. Riccardi*, 405 F.3d 852, 863 n.1 (10th Cir. 2005) ("Nothing in the record indicates that the affidavit was attached to the warrant, and the exception therefore does not apply.").

In addition, the warrant does not say that it incorporates the affidavit. The Supreme Court addressed a similar issue in *Groh v. Ramirez*, 540 U.S. 551 (2004). There the Court stated that "the warrant did not incorporate other documents by reference" merely by reciting that the magistrate judge had been satisfied by the showing of probable cause. *Groh*, 540 U.S. at 558, 555. Under *Groh*, mere mention of the affidavit does not expressly incorporate the affidavit.

In our case, the warrant mentions the affidavit in two places, but only to note that (1) a detective "filed an affidavit for search warrant" and (2) the warrant's authorization is "[o]n the basis of the information set forth in the affidavit." R. sup. vol. at 2, 3. These notations did not expressly incorporate the affidavit.

\* \* \*

The affidavit could cure the defect in the warrant only if the affidavit was attached and expressly incorporated into the warrant. These requirements are not satisfied here. As a result, particularity in the *affidavit* could not cure the defect in the *warrant*.

**4.     The defective parts of the warrant are not severable.**

The warrant's overbreadth does not necessarily require suppression, for flaws in a warrant can sometimes be severed from the remainder of the warrant. Thus, the government suggests that the defect is severable from the remaining parts of the warrant.[3] We disagree.

The severability doctrine provides that when some parts of the warrant are valid and others are not, suppression is necessary only when evidence is seized pursuant to the invalid parts of the warrant. *United States v. Sells*, 463 F.3d 1148, 1150 (10th Cir. 2006). But the severability doctrine "applies only if 'the valid portions of the warrant [are] sufficiently particularized, distinguishable from the invalid portions, and make up the greater part of the warrant.'" *Id.* at 1151 (quoting *United States v. Naugle*, 997 F.2d 819, 822 (10th Cir. 1993)).

We may assume, for the sake of argument, that our warrant contains valid parts that are distinguishable from the invalid parts. Even with this assumption, the valid parts of the warrant would not predominate because

---

[3]     Mr. Dunn contends that the government waived this argument. For the sake of argument, however, we assume that this argument was not waived.

8

the valid portions would not constitute the greater part of the warrant even if the nine listed categories were valid and distinguishable from the "not limited to" clause. A "warrant's invalid portions, though numerically fewer than the valid portions, may be so broad and invasive that they contaminate the whole warrant." *Sells*, 463 F.3d at 1160. Here the catch-all provision, allowing officers to search for any item for any reason, is all-encompassing.

*Cassady* provides guidance on how to assess severability in the context of a warrant with a catch-all provision. There we divided the warrant into "three general parts: (1) the section authorizing seizure of narcotics and related illegal contraband; (2) the section authorizing seizure of all other evidence of criminal activity; and (3) the section authorizing seizure of [the appellant's] personal property if its seizure is authorized on a number of enumerated grounds totally unrelated to [the underlying offense]." *Cassady*, 567 F.3d at 638. We assumed that the first part was valid and determined that the second and third parts were not. We then held that "the invalid portions of the warrant were sufficiently 'broad and invasive' so as to 'contaminate the whole warrant.'" *Id.*at 641 (quoting *Sells*, 463 F.3d at 1151). We added that the "invalid portions 'allow[ed] for the seizure of evidence, whether or not related to [the underlying crime]," and the "warrant epitomize[d] a general warrant." *Id.* (quoting *Voss v. Bergsgaard*, 774 F.2d 402, 406 (10th Cir. 1985)).

9

The same considerations apply here. The catch-all provision allows for the search of any item for any reason, even if the item does not constitute evidence of criminal activity. This provision is even broader than the tainted provisions in the *Cassady* warrant. Thus, the catch-all provision renders the warrant non-severable even if other parts of the warrant were valid and distinguishable from the invalid parts.

**5.    Summary**

The warrant does not satisfy the particularity requirement. Thus, the warrant was invalid and subject to the exclusionary rule.

**III.   The good-faith exception does not preclude application of the exclusionary rule.**

The district court invoked the good-faith exception to the exclusionary rule. In our view, this exception does not apply.

**A.    Standard of Review**

In addressing the district court's application of the good-faith exception, we engage in de novo review. *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000) (stating that the application of the good-faith exception presents a question of law, which the court reviews de novo).

**B.    The good-faith exception does not apply.**

The exclusionary rule's purpose is to deter Fourth Amendment violations. *United States v. McCane*, 573 F.3d 1037, 1042 (10th Cir. 2009).

10

Thus, the good-faith exception provides that evidence seized under a defective warrant should not be suppressed if executing officers had reasonably relied on the warrant's validity. *United States v. Leon*, 468 U.S. 897, 922 (1984); *Danhauer*, 229 F.3d at 1006. But the good-faith exception does not apply when the warrant is so lacking in particularity that the executing officers cannot reasonably presume the warrant to be valid. *Leon*, 468 U.S. at 923.

### C. No officer could have reasonably regarded the warrant as valid.

Mr. Dunn argues that the good-faith exception does not apply. He explains that the warrant was facially deficient in failing to particularize the things to be seized, preventing the executing officers from reasonably presuming the warrant to be valid. We agree.

The infirmity in the warrant was obvious under *Cassady*. As discussed above, we held in *Cassady* that officers could not reasonably rely on a warrant that contained a catch-all phrase authorizing officers to search for "all other evidence of criminal activity." *Cassady v. Goering*, 567 F.3d 628, 635 (10th Cir. 2009).[4] This catch-all phrase led the *Cassady* panel to

---

[4] In *Cassady*, the issue involved qualified immunity, which turned on whether the underlying right had been clearly established. *Cassady v. Goering*, 567 F.3d 628, 634, 643 (10th Cir. 2009). But the test is the same as the one for the good-faith exception. *See Groh v. Ramirez*, 540 U.S. 551, 565 n.8 (2004) ("Although both *Sheppard* and *Leon* involved the application of the 'good faith' exception to the Fourth Amendment's general exclusionary rule, we have explained that 'the same standard of

11

conclude that the defect was so obvious that no executing officer could reasonably rely on the warrant. *Id*. at 644.

The warrant here is even broader than the one in *Cassady*. In our case, the warrant authorized the search for not only any item, but also any item for any reason. Therefore, executing officers could not reasonably rely on the warrant to search Mr. Dunn's apartment.

**D.      The government's reliance on public policy is misguided.**

The government contends that suppression would not serve the purpose of the exclusionary rule. We disagree. Application of the exclusionary rule here serves to remind officers that the particularity requirement is more than a technicality; it is a shield against the "general warrant abhorred by colonists." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

## IV.   Conclusion

The Fourth Amendment requires particularity in search warrants. This requirement was violated here, for

- the warrant allowed executing officers to search for anything in Mr. Dunn's apartment for any reason and

- *Cassady* precluded any reasonable officer from relying on the warrant.

---

objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 344 (1986))).

Thus, we conclude that the district court erred in denying the motion to suppress.[5]

Reversed.

Entered for the Court

Per Curiam

---

[5] The motion to expedite a decision is moot with the filing of this order and judgment.

Case No. 15-1475, *United States v. Dunn*
**O'BRIEN**, J., concurring in the result.

I concur in the result announced in the Order and Judgment (O&J). I write

separately because the terseness of the O&J fails to reveal the dynamics of the case or the

immanent difficulties it presents. In the end, it comes down to this: in seeking a search

warrant, the police asked for too much and, in issuing a warrant, the judge required too

little; the paucity of his effort epitomizes the long decried "rubber stamp." The propriety

of his finding of probable cause is at least debatable and the overbreath of the warrant is

considerable. The good faith doctrine announced in *Leon*[1] can save the former but not

the latter.

Colorado police officers were trying to solve a stabbing murder. They had reason

to believe Aaron Dunn's apartment (and/or a vehicle) contained evidence of the crime

and requested a warrant permitting them to search both. They presented the request to a

general jurisdiction state trial judge, one who, by all accounts, should know the law.

Quite inexplicably, the law-trained judge issued a warrant based upon an affidavit failing

to supply probable cause for the search and which did not heed the particularity

requirements of the Fourth Amendment. When officers searched Dunn's apartment, it is

unclear whether they found any evidence related to the murder,[2] but they did find two

firearms belonging to Dunn, a convicted felon prohibited from possessing them. For his

unlawful possession of weapons, Dunn was charged with a federal crime—another

---

[1] *See United States v. Leon*, 468 U.S. 897 (1984).

[2] At the motion to suppress hearing, the government said the officers found a knife in Dunn's apartment. The record reveals nothing beyond that.

felony. He moved, unsuccessfully, to suppress the fruits of the search for and seizure of his weapons.

The words of Abraham Lincoln, although uttered in a different context, are prophetic: "The true rule, in determining to embrace, or reject anything, is not whether it have any evil in it; but whether it have more of evil, than of good." Rep. Abraham Lincoln, *Speech in the U. S. House of Representatives on Internal Improvements* (June 20, 1848). And so it is here, as we consider the search warrant at issue in this appeal.

The Fourth Amendment to our Constitution requires search warrants be based on probable cause and particularly describe "the place to be searched, and the persons or things to be seized." To facilitate that requirement the Supreme Court adopted a rule prohibiting the government from introducing evidence at trial if the police obtained the evidence in violation of the Fourth Amendment (the exclusionary rule). As it turned out, the rule often did more harm than good by crippling the prosecution of criminals without providing a corresponding benefit to society. Therefore, the Court amended and qualified it.[3] *Leon*, 468 U.S. at 918-925. As it now stands, the rule's only purpose is to deter police misconduct. *Id*. at 916-18. It is not a remedy for judicial mistakes, *id*., which in large measure are responsible for the problems with this case.

In an oral decision, the district judge decided the search warrant was defective, but, considering the totality of the circumstances, the officers reasonably relied on it (good faith exception) to search Dunn's apartment. I agree in part. Even if the warrant

---

[3] Maintaining balance on the ship of state sailing "the boisterous seas of liberty is never without a wave." Thomas Jefferson (1820). Compromise is imperfect and frequently unsettling, but necessary.

2

was not supported by a showing of probable cause (as the district judge concluded), the affidavit supporting it was sufficient to satisfy *Leon's* good faith test (the officers' reliance on the warrant was reasonable). In the other respect, particularity, the result is different. Under our case law, the warrant was so deficient *Leon* cannot save it.

## I. Background

### A. *The Stabbing*

In the early evening of February 25, 2016, officers from the Lakewood Police Department responded to a report of a stabbing at a motel in Lakewood, Colorado. When they arrived, two motel patrons were rendering aide to the victim, Kendra Chavez, who was bleeding from the neck (she died four days later). Those individuals, as well as one other, reported seeing her with an unidentified male who left the scene with her backpack. From a photo lineup, two of those individuals picked Leonard Martinez,[4] Chavez's boyfriend, as the individual they observed with her. Officers searched the area for Leonard but were unable to locate him. They obtained an arrest warrant and a warrant to search the motel room where Chavez lived. The search of the motel room came up short—they found a significant amount of blood, but no knife or other cutting object.

### B. *The Search Warrant for Dunn's Apartment*

After obtaining another search warrant, officers began tracking Leonard's cell phone. On February 27, two days after the murder, officers were able to place Leonard's

_____

[4] Leonard Martinez, the stabbing suspect, and his brother, Vincent, are both involved in this case. I will refer to them by their first names.

3

cell phone in an apartment complex at 8133 W. Floyd Avenue.  Officers, including Sergeant Theodore McNitt and Detective Clay Fuller, began surveillance and eventually observed Leonard's brother, Vincent, arrive at Building #8 in a green 2003 GMC Envoy. Vincent went to Unit 204, which Dunn was leasing.  They later saw Leonard leave Unit 204 with a backpack and an unknown object in his hands.  He placed the backpack in Vincent's vehicle.  The officers arrested Leonard.  They also spoke with Vincent, who told them: (1) he was visiting Dunn and (2) Leonard had also been in the apartment. They also learned that Dunn and Leonard had been contacted together by law enforcement in December 2014.

That same day, Detective Jonathan Lee (Lakewood, Colorado Police Department) submitted an affidavit to a state court judge in Jefferson County, Colorado, seeking a warrant to search Dunn's apartment and Vincent's GMC Envoy.  The substantive portion of the affidavit for the search warrant spans four pages.  It mainly recounts the stabbing but includes one paragraph linking Leonard to Dunn's apartment:

> On February 27, 2015 law enforcement monitored cell phone GPS locations related to Leonard's phone number.  The GPS location directed law enforcement to the area of 8233 W Floyd Ave.[5]  Leonard's brother, Vincent Martinez, arrived at the south side of building #8 in a green 2003 GMC Envoy bearing [a] Colorado license plate . . . .  This license plate registers to Vincent Martinez.  Vincent went into the corridor that leads to 8233 W Floyd Ave #8-204.  Aaron Dunn is the leased resident at the address.  Detective Langley advised Leonard and Aaron Dunn were contacted together by law enforcement in December 2014.  Law

---

[5] The affidavit and warrant listed the address as 8233 W. Floyd Avenue #204 rather than 8133 W. Floyd Avenue #204.  In the district court, Dunn conceded it was "an apparent typographical error" and the affidavit and warrant otherwise accurately described the apartment.  (R. Vol. 1 at 14 n.3.)

enforcement observed Leonard leaving the same corridor leading from the residence at 8233 W Floyd Ave #8-204 with a backpack and an unknown object in his hands. Leonard placed the backpack in Vincent's green 2003 GMC Envoy before being taken in custody. Vincent told Detective Langley he was visiting Aaron Dunn and that Leonard was in the apartment as well.

(Supp. R. at 6.)

Based on the facts outlined in the affidavit, the "affiant contend[ed] that the following items may be located [in Dunn's apartment and Vincent's vehicle] and of evidentiary value during criminal proceedings":

- Documents that show ownership or occupancy of the residence/business including but not limited to mail, rental agreements, utility paperwork, mortgage payments/documents, etc.
- Any clothing or garments with bodily fluid, damaged clothing
- Weapons to include knives, sharp instruments
- Backpacks
- Any backpack, bag, or purse belonging to Kendra Chavez
- Cell phones
- Handwritten notes, day planners, cell phones, computers, paperwork, other items capable of storing data, locked safes
- DNA evidence whether visible to the human eye or which may be revealed by scientific examination, to include blood, dried blood, saliva, hairs, skin cells, body fluids, latent impressions, etc.
- Photography, videography, and any other crime scene processing deemed pertinent.[6]

(Supp. R. at 6-7.) The affiant also "request[ed] that safes seized from the permitted area be opened and searched" and that seized "cell phones, computers and other items capable of storing data . . . be downloaded and examined either manually or forensically." (*Id*. at

---

[6] Dunn admits that the last category was probably intended to authorize officers to videotape and photograph the crime scene.

5

7.)  The search warrant authorized the seizure of the same nine categories of items listed in the affidavit.

But the warrant goes further.  It states the "[i]tems to be searched for and seized include *but are not limited to*" the nine categories of items.  (Supp. R. at 2 (emphasis added).)  It refers to the affidavit but nothing of record shows the affidavit to have been attached to the warrant.

The (template-based) warrant also describes the location of Dunn's apartment and Vincent's GMC Envoy.  It contains checks in the form's boxes for each of the six grounds for a search contained in Colo. R. Crim. P. 41.[7]  It provides for the search and seizure of property (1) "[w]hich is stolen or embezzled;" (2) "[w]hich is designed or intended for use as a means of committing a criminal offense;" (3) "[w]hich is or has been used as a means of committing a criminal offense; (4) "[t]he possession of which is illegal;" (5) "[w]hich would be material evidence in a subsequent criminal prosecution in this state or in another state;" or (6) "[o]ther."  (Supp. R. at 3.)  *See* Attachment A (names of witnesses have been redacted for their protection).

The state judge signed the search warrant just as it was presented by the officers.  By so doing, he indicated he was "satisfied that there is probable cause to believe that the property so described is located within the above described and that the grounds for this search warrant exist."  (Supp. R. at 3.)

C. *Execution of Search Warrant and Indictment*

---

[7] It appears the boxes were already checked when the warrant was presented to the judge.

6

Prior to the search of Dunn's apartment, Sergeant McNitt made significant discoveries: Dunn had a prior felony juvenile adjudication for burglary and was currently serving a deferred sentence for felony menacing with a real or simulated weapon. During the search, Detective Fuller discovered a shotgun in the top drawer of a dresser (located in the master bedroom) containing male clothing; the same drawer contained a letter addressed to Dunn. Based on his knowledge of Dunn's criminal history, McNitt directed Fuller to seize the shotgun because Dunn (a convicted felon) could not lawfully possess weapons. Officers also seized a locked safe from the closet of the master bedroom. About a week later Dunn provided the safe's combination to the officers; within it was another firearm. Ultimately, he was indicted for being a felon in possession of a firearm.

*D. Motion to Suppress*

Dunn moved to suppress the firearms. He claimed the affidavit in support of the search warrant for his apartment lacked the requisite showing of probable cause—there was no reason to believe evidence of the stabbing would be found in the apartment given that the stabbing had occurred two days prior and there was no indication that Leonard had gone to the apartment shortly after the stabbing. While he primarily focused on the lack of probable cause, he also presented a narrow particularity argument, which changed as the case progressed. In his written motion, he simply argued the warrant lacked particularity because it allowed the seizure of <u>all weapons</u> yet the crime being investigated was a stabbing. At the motion to suppress hearing, he expanded his

7

particularity argument, claiming the "not limited to" language in the warrant improperly allowed the officers to search for anything.[8]

The government maintained the affidavit did provide probable cause: "Given that [Leonard] appeared to have gone to [Dunn's] apartment less than 36 hours[9] after he stabbed his victim, and that officers had no evidence that [Leonard] went anywhere else or deposited any of his belongings anywhere else *before* he went to [Dunn's] apartment, the state judge had a substantial basis for concluding that probable cause existed to search the apartment for evidence of the stabbing." (R. Vol. 1 at 26.) However, even if the affidavit failed to show probable cause, the government claimed the exclusionary rule should not apply because the officers acted in good faith reliance on the warrant.

As to particularity, the government's arguments in the district court were limited; it only responded to the arguments in Dunn's <u>written</u> motion. It did not clearly respond to Dunn's oral expansion of his particularity argument. It argued the warrant permissibly allowed the seizure of all weapons because the officers knew Leonard had a history with firearms, having been arrested on July 2, 2013, for running from agents and tossing a

---

[8] Dunn also argued officers exceeded the scope of the warrant by seizing the safe. The government argued the warrant explicitly authorized the officers to seize locked safes and the district judge agreed. This ruling is not at issue here.

[9] In its opposition to the motion to suppress, the government said 36 hours because the stabbing occurred at approximately 6:30 p.m. on February 25 and Leonard's phone had been "pinging" to Dunn's apartment since at least 5:30 a.m. on February 27. (R. Vol. 1 at 22.) But the affidavit in support of the warrant only specified the time of the stabbing, not when the pings to Dunn's apartment occurred. Perhaps recognizing this, the government now says (as it did at the motion to suppress hearing) 48 hours elapsed between the stabbing and Leonard's presence in Dunn's apartment.

handgun.[10]  And, the argument continued, although the police knew the murder occurred by stabbing, Leonard could have brandished or used a firearm or other weapon during the stabbing.  More credibly, it also claimed that because the officers had probable cause to search for a knife, they had the authority to open a dresser drawer, where a knife could be found.  And, once the officers opened the drawer, they could seize the gun because it was contraband—Dunn's criminal history prohibited him from possessing firearms.

The district judge acknowledged the rule entitling a state court judge's probable cause finding to "great deference."  (R. Vol. 3 at 42.)  Nevertheless, he decided the affidavit failed to show a fair probability that evidence of the stabbing would be found in Dunn's apartment (no probable cause).  In his words, "the only fair reading of the affidavit would be that Mr. Dunn and [Leonard] are friends," not that Leonard lived or stayed in the apartment.  (*Id*. at 45.)  He also found it illogical to assume anyone would haul a murder weapon (a knife) around or still be wearing bloody clothes two days after a stabbing, let alone discard those clothes while visiting a friend.  In the end, however, he concluded the good faith exception to the exclusionary rule applied because the officers reasonably relied upon the warrant issued by the state court judge.  An officer's reliance on a warrant is not permitted when the affidavit supporting it is so lacking that official belief in the existence of probable cause is unreasonable.  The judge acknowledged the rule, but decided it was inapplicable here.  The affidavit was not "'devoid of factual support'" and it established a sufficient "'minimal nexus'" between the apartment and

---

[10] The affidavit in support of the search warrant made no mention of this incident.

Leonard, the stabbing suspect, to justify the search. (*Id.* at 50 (quoting *United States v. Birch*, 401 F. App'x 351, 354 (10th Cir. 2010) (unpublished)).)

With regard to particularity, the judge's discussion was as terse as Dunn's argument: even if the warrant was otherwise overbroad, the officers were legitimately permitted to search for cutting instruments, which could be found in a dresser drawer. Accordingly, the seizure of the gun was permitted by the plain-view doctrine. His oral decision made no mention of the "not limited to" language.

Dunn entered a conditional guilty plea, reserving the right to appeal from the judge's suppression ruling. The judge varied downward from the advisory sentencing guideline range of 30 to 37 months, sentencing him to 26 months imprisonment.[11]

## II. Discussion

A very narrow issue is presented—whether the good faith exception to the exclusionary rule applies.[12] That question is a legal one reviewed de novo. *See United States v. Danhauer,* 229 F.3d 1002, 1005 (10th Cir. 2000).

---

[11] Dunn requested a downward variance to 20 months based on his lack of parental guidance as a youth, his good employment record, and the many letters of support from family and friends. The government opposed his request, seeking instead a 30-month sentence. The judge believed a variance was justified but not to the extent requested by Dunn because his criminal history revealed he doesn't follow court rules or appreciate consequences.

[12] Whether the search warrant is supported by probable cause is off the table. The government chose not to cross-appeal from that decision, relying instead on the good faith exception to the exclusionary rule. While we are not necessarily bound by the government's concession, I need not address the probable cause issue because, as I explain, the good faith exception applies as to this issue.

Although the O&J addresses the severability doctrine, which may be used to preserve an otherwise overbroad warrant, I believe the government has waived any

10

*A. The Fourth Amendment and the Warrant Requirement*

As always, it is most appropriate to start with the language of the Fourth Amendment: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Accentuating the obvious never hurts. The amendment contains two distinct requirements—one requiring <u>searches and seizures</u> to be reasonable and the other requiring <u>warrants</u> to, *inter alia*, be based on probable cause and particularly describe the place to be searched and the things to be seized. The text of the Fourth Amendment does not require a warrant in order for a search or seizure to be reasonable. That requirement came from the Supreme Court, which at one time presumed all warrantless searches to be unreasonable. *See, e.g., Katz v. United States*, 389 U.S. 347, 357 (1967) ("Over and again this Court has emphasized that the mandate of the Fourth Amendment requires

---

reliance on that doctrine. *See United States v. Sells*, 463 F.3d 1148, 1155 (10th Cir. 2006) (under the severability doctrine, "valid portions of a warrant are severed from the invalid portions and only materials seized under the authority of the valid portions, or lawfully seized while executing the valid portions, are admissible"). It did not raise the issue with the district court and expressly waives the issue in its appellate brief. *See* Government's Br. at 11 n.5.

Dunn's particularity argument in the district court was limited primarily to the language in the warrant authorizing the seizure of "[w]eapons to include knives, sharp instruments." (Supp. R. at 2.) Dunn has expanded his particularity argument on appeal. While the government points this out, it falls short of suggesting Dunn has waived any particularity argument beyond that argued in the district court. Had it been more forceful it might have prevailed in this appeal. As it stands, the government has "waived the waiver." *United States v. Heckenliable*, 446 F.3d 1048, 1049 n.3 (10th Cir. 2006).

11

adherence to judicial processes, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment . . . .") (quotation marks omitted). Since then the Court has retreated from that broad assertion by creating numerous exceptions. Now, as Justice Thomas aptly observed: "[O]ur cases stand for the illuminating proposition that warrantless searches are *per se* unreasonable, except, of course, when they are not." *See Groh v. Ramirez*, 540 U.S. 551, 572-73 (2004) (Thomas, J., dissenting).

This case does not involve a warrantless search, but reasonableness is front and center. The warrant here, Dunn says, lacks probable cause and particularity, both explicit requirements of the Fourth Amendment.

*B. The Exclusionary Rule and the Good Faith Exception*

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Herring v. United States*, 555 U.S. 135, 139 (2009) (quotation marks omitted). Like the "warrantless searches are per se unreasonable" rule, the "exclusionary rule" came from the pen of the Supreme Court. But it, too, was destined for change. The rule, we have learned, was imposed as a prophylactic, specifically designed to deter police misconduct.

The rule "is not a personal constitutional right, nor is it designed to redress the injury occasioned by an [unlawful search or seizure]." *Davis v. United States*, 564 U.S. 229, 236 (2011) (quotation marks omitted). Indeed, "[t]he wrong condemned by the [Fourth] Amendment is fully accomplished by the unlawful search or seizure itself and the exclusionary rule is neither intended nor able to cure the invasion of the defendant's

12

rights which he has already suffered." *Leon*, 468 U.S. at 906 (citation and quotation marks omitted).

It bears repeating: the exclusionary rule is designed to deter <u>future</u> <u>police</u> <u>misconduct</u>. *Id*. at 916. Importantly, it was <u>never</u> meant to "punish the errors of [issuing] judges and magistrates." *Id*. The Supreme Court found no reason to believe judges ignore the Fourth Amendment or "that exclusion of evidence seized pursuant to a warrant would have a significant deterrent effect on [them]." *Arizona v. Evans*, 514 U.S. 1, 11 (1995); *see also Leon*, 468 U.S. at 916. Therefore, when exclusion would not appreciably deter <u>the police</u>, "exclusion is clearly unwarranted." *Davis*, 564 U.S. at 237 (quotation marks omitted); *see also Herring*, 555 U.S. at 141 ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation. Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future.") (citations omitted).

While deterrence "is a necessary condition for exclusion, . . . it is not a sufficient one." *Davis*, 564 U.S. at 237 (quotation marks omitted). We must also consider the social costs of exclusion. *Id*. Suppression "exacts a heavy toll on both the judicial system and society at large" because it generally requires courts to ignore reliable evidence of guilt. *Id*. "[I]ts bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id*.; *see also Herring*, 555 U.S. at 141 ("The principal cost of applying the [exclusionary] rule is . . . letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system.") (quotation marks omitted). Thus, "[e]ven where there is a

13

Fourth Amendment violation, th[e] exclusionary rule does not apply when the costs of exclusion outweigh its deterrent benefits."[13] *Utah v. Strieff*, --- U.S. ---, 136 S. Ct. 2056, 2059 (2016). Exclusion of evidence is always the "last resort, not [the] first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

The deterrent value of exclusion is high and tends to outweigh its costs "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Davis*, 564 U.S. at 238; *see also Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."). On the other hand, "when the police act with an objectively reasonable good faith belief that their conduct is lawful, . . . the deterrence rational loses much of its force and exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (quotation marks omitted). In plain language, when officers reasonably rely on a warrant issued by a detached and neutral judicial officer, the exclusionary rule does not apply (the good faith exception). *Leon*, 468 U.S. at 913.

This is not to say that the exclusionary rule never applies when officers obtain a warrant issued by a judicial officer. *Leon* outlined four situations in which officers' reliance on the warrant would not be objectively reasonable: (1) if the issuing magistrate or judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth" [corrupt

---

[13] The list of cost/benefit exceptions to the exclusionary rule continues to grow, but it seems the Supreme Court has reserved to itself the role of identifying exceptions.

14

officers, typically addressed in a *Franks* hearing[14]]; (2) if "the issuing magistrate wholly abandoned his judicial role" [the judge was corrupt or blissfully ignorant]; (3) if the affidavit for the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" [the judge failed to critically read the affidavit or lacked an appreciation of probable cause]; and (4) if the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid" [the judge was so ignorant, indolent, or both, that a fundamental judicial responsibility died aborning].  468 U.S. at 923 (quotation marks omitted).  The first ground rests on active or constructive misconduct by the police.  The remaining three are simply a failsafe, lest the good faith exception entirely swallow the exclusionary rule.  The O&J reverses only on the fourth ground.  Since Dunn relies on both the third and the fourth grounds, I address both.

   *C. Whether the Affidavit Lacked Sufficient Indicia of Probable Cause*

   A warrant is based on probable cause if the magistrate makes a "practical, common-sense decision" that "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Thus, the "affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  *Danhauer*, 229 F.3d at 1006.

---

[14] *See Franks v. Delaware*, 438 U.S. 154 (1978).

A court has "discretion to address probable cause or to proceed directly to [the] good faith [exception]." *See United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005). Because the government has chosen not to challenge the judge's decision that probable cause was wanting, I move directly to the good faith analysis.

When officers rely on a warrant, it is generally presumed that they acted in objective good faith. *United States v. Augustine*, 742 F.3d 1258, 1262 (10th Cir. 2014); *see also Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in objective good faith.") (quotation marks omitted). This is because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, *if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment*." *Leon*, 468 U.S. at 921 (emphasis added); *see also Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986) ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination.") (quotation marks omitted).

Nevertheless, "[w]hile officers are generally entitled to rely on the magistrate's judgment, they are also required to exercise their own professional judgment. Indeed, law enforcement officials are presumed to have a reasonable knowledge of the law, and we determine good faith in this context by considering whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Gonzales*, 399 F.3d at 1230 (citation and quotation marks omitted). "The question [therefore] is not whether the magistrate erred in believing there was sufficient

16

probable cause to support the scope of the warrant he issued.  It is instead whether the magistrate so obviously erred that any reasonable officer would have recognized the error."  *Messerschmidt*, 565 U.S. at 556.

"[G]ood faith may exist when a *minimal* nexus between the place to be searched and the suspected criminal activity is established."  *Gonzales*, 399 F.3d at 1231 (emphasis added).  However, an officer's reliance on a warrant is not reasonable "when the underlying documents are devoid of factual support . . . ."  *Id*. at 1230 (quotation marks omitted); *see also United States v. Campbell*, 603 F.3d 1218, 1230 (10th Cir. 2010) ("Officers' reliance [on a warrant] is only entirely unreasonable when the affidavit is devoid of factual support.") (quotation marks omitted).  "For good faith to exist, there must be *some* factual basis connecting the place to be searched to the defendant or suspected criminal activity."  *Gonzales*, 399 F.3d at 1231.  "[T]he government, not the defendant, bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable."  *United States v. Cook*, 854 F.2d 371, 373 (10th Cir.1988) (quotation marks omitted).

According to Dunn, a reasonable officer would have known the affidavit lacked probable cause to search his apartment.  He argues that probable cause to search a residence is not established by the mere presence of a criminal suspect there; something more is required linking the residence to the crime (actually, evidence related to the crime), *see United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998), and the affidavit failed to provide that "something more."  He punctuates his argument by noting that Leonard was seen carrying a backpack and another item <u>away</u> from the residence.

17

This, he says, "indicate[s] that evidence of the stabbing would *not* be found in the home." (Appellant's Op. Br. at 36.)

The government, for its part, contends the affidavit established the required minimal nexus between Dunn's apartment and the stabbing, thus establishing good faith: (1) Leonard's cell phone was linked to the apartment within 48 hours after the stabbing; (2) the murder weapon and the clothes Leonard was wearing had not been recovered; (3) Leonard and Dunn were previously acquainted; (4) Leonard was seen leaving Dunn's apartment with a backpack (which could have been Chavez's) and an unknown object; and (5) Vincent told police Leonard had been visiting Dunn in his apartment. "Probable or otherwise, certainly an inference existed that . . . Leonard might have used his friend's apartment to stash evidence of the crime." (Government's Br. at 10-11.)

I agree with the government. The affidavit is not devoid of factual support; it describes circumstances from which officers could reasonably believe evidence of the stabbing would be found in Dunn's apartment. Leonard, the stabbing suspect, was at Dunn's apartment two days after the incident. Leonard and Dunn were previously linked together by law enforcement in December 2014, indicating they were long-term acquaintances, if not friends. Although Leonard was seen leaving the apartment with a backpack, the officers did not know whether it was Chavez's. They also did not know what might have been in the backpack or in his hand. One might reasonably infer Leonard left the bag's contents—the murder weapon and the clothes he was wearing on the night of the stabbing—at his friend's apartment or placed them in Vincent's vehicle. *Rowland*, 145 F.3d at 1205 ("In making the probable cause determination, the issuing

18

magistrate may draw reasonable inferences from the material provided in the warrant application."). After all, the warrant authorized a search of not only Dunn's apartment but also the vehicle, where officers saw Leonard place the backpack.[15] As such, the officers could have reasonably believed the vehicle contained evidence of the murder, at the very least Chavez's backpack. It is not for us to weigh the relative merits of reasonable inferences. Instead, we credit inferences officers could reasonably draw. *See United States v. Pickel*, 863 F.3d 1240, 1248 (10th Cir. 2017).

Dunn resists. He relies on *Rowland* which, he claims, put the officers in this case on notice that something more than Leonard's mere presence in Dunn's apartment was necessary to establish probable cause. Therefore, according to him, reliance on an affidavit lacking that "something more" was unreasonable, rendering the warrant defective. In *Rowland* the officers obtained an anticipatory warrant[16] to search Rowland's residence for child pornography. 145 F.3d at 1199. Yet the only link in the

_____

[15] The record does not reveal whether Vincent's vehicle was searched and, if so, whether the officers discovered evidence or contraband therein.

[16] Anticipatory warrants differ from traditional search warrants:

> At the time of issuance [anticipatory warrants] are not supported by probable cause to believe that contraband is currently located at the place to be searched. In fact, a court issues an anticipatory warrant with the knowledge that the contraband does not presently exist at the location to be searched. This does not mean, however, that anticipatory warrants need not be supported by probable cause. Instead, before issuing an anticipatory warrant the magistrate must determine, based on the information presented in the warrant application, that there is probable cause to believe the items to be seized will be at the designated place when the search is to take place.

*Rowland*, 145 F.3d at 1201 (citations and quotation marks omitted).

affidavit between his residence and the child pornography was his past conduct—in the past they had observed him pick up mail from his post office box and proceed to work. *Id*. at 1204. Based on this conduct, they made a controlled delivery of child pornography to his post office box, anticipating he would pick it up from the post office, bring it to work, and then take it home. *Id*. We concluded the affidavit failed to establish a nexus between Rowland's residence and the child pornography because there was "no information suggesting that Rowland had previously transported contraband from his private post office box to his home or that he had previously stored contraband at his home." *Id*. Here, in contrast, the affidavit contained "something more." First, the officers did not "anticipate" that Leonard would show up at Dunn's apartment, they knew he had been there—they saw him leave the apartment and Vincent told them Leonard had been in the apartment. They also knew Leonard and Dunn were long-term friends or acquaintances and, most importantly, they saw Leonard leave with a backpack, which indicated he may have brought incriminating items to Dunn's apartment and left them there or placed them in Vincent's vehicle.

The affidavit could have provided more and the warrant-issuing judge should have demanded more. But second-guessing the judge's decision to sign off on the warrant is unwarranted. If the judge had questions or concerns, he should have expressed them to the officers, who might then have been able to amend the affidavit, providing more information. His failure to do so presumes satisfaction with the information provided and the officers would have no reason to offer more. As the Supreme Court explained in *Leon*, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's

20

probable-cause determination . . . . Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." 468 U.S. at 921 (quotation marks omitted).

Again, our review is attenuated. We need not find probable cause, only a sufficient nexus between the place to be searched and evidence of the suspected criminal activity. *Gonzales*, 399 F.3d at 1231. When officers rely on a warrant, it is generally presumed that they acted in objective good faith. *United States v. Augustine*, 742 F.3d 1258, 1262 (10th Cir. 2014); *see also Messerschmidt*, 565 U.S. at 546. The exclusionary rule was neither designed nor intended to spotlight judicial errors (or punish the issuing judge), but rather to deter future police misconduct. *Leon*, 468 U.S. at 916. Like the district judge, I see nothing to deter in this case; use of the rule would not serve its deterrent function. *See Rowland*, 145 F.3d at 1208 ("Penalizing the officers for a mistake not their own cannot logically contribute to the deterrence of Fourth Amendment violations.") (quotation marks omitted).

### D. Whether the Warrant Was Facially Deficient

The Fourth Amendment requires warrants to particularly describe the places to be searched and the things to be seized. "The concern originally animating [the] particularity requirement was a wish to prevent the sort of warrants English kings once favored, ones that proscribed few limits on the scope of the search to be conducted and included no explanation [of] why they were issued. Even today the particularity requirement remains a vital guard against wide-ranging exploratory searches, a promise that governmental searches will be carefully tailored to their justifications." *United*

*States v. Christie*, 717 F.3d 1156, 1164 (10th Cir. 2013) (quotation marks omitted). In other words, "[t]he particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985).

The content of an affidavit supporting a search warrant is primarily the product of the officers, who are requesting a warrant based on facts they know and present. Typically, the judge reviews the affidavit and makes a binary decision—probable cause has, or has not, been shown. The details of a warrant, on the other hand, are singularly within the province of the issuing judge and require more than a yes or no. The process should command the judge's attention in a meaningful way and the product—the warrant—should reflect careful thought and a clear understanding of Fourth Amendment law. After all, the judge is responsible for determining and articulating the scope of the warrant (what to look for, where to look, and what to seize). That calls for judgment: application of the law to the facts presented—the grist for the judicial mill, which is the workplace of judges. A judge who merely signs a prepared form or recklessly checks a few boxes abandons the (self-proclaimed) role of the judicial offices as the guardians of the Constitution.

Since particularity errors are peculiarly judicial errors, deterring police misconduct is not much at issue. I often wonder how a law-trained judge could unwittingly make a particularity mistake so obvious that the police must necessarily (are presumed to) recognize it. In some cases the good faith doctrine should, and does, permit overlooking particularity errors. I think this is one of those cases. That said, I bow to circuit

22

precedent as laid out in the O&J and I concur in the result. An obedient, but reluctant, warrior, am I.[17]

The result here does not square with *Leon*'s rhetoric—deterrence of police misconduct is the only role of the exclusionary rule. I see little to deter. Rather than conduct warrantless searches these officers repeatedly sought and obtained search and seizure warrants: to search Chavez's apartment, to track Leonard's cell phone, and to search Dunn's apartment and Vincent's vehicle. What's more, they seized Dunn's safe, but did not open it; he provided the combination. There is more.

The state judge signed the warrant. The officers neither misrepresented facts to obtain the warrant, nor cherry picked an "easy" or ill-informed judge (at least, there is no such claim). Despite the broad language used in the warrant, the officers appear to have limited their search to places where evidence of the stabbing might be found[18]—the firearms were found in a dresser drawer and a safe—and they only seized the firearms

---

[17] "Judges march at times to pitiless conclusions under the prod of a remorseless logic which is supposed to leave them no alternative. They deplore the sacrificial rite. They perform it, none the less, with averted gaze, convinced as they plunge the knife that they obey the bidding of their office." Benjamin N. Cardozo, The Growth of the Law 66 (1924). This panel has no alternative, bound as we are to circuit precedent. It feels less like a pitiless conclusion; more like an ill-fated mission. "Theirs not to make reply, Theirs not to reason why, Theirs but to do and die: Into the valley of Death Rode the six hundred." Alfred Lord Tennyson, The Charge of the Light Brigade (1854).

[18] A warrant failing to meet the particularity requirements of the Fourth Amendment is to be condemned, but mere condemnation ought not lead to the exclusion of evidence simply because it could possibly have, but did not, in fact, result in an overbroad search. That is the lesson of the harmless error doctrine and it should also serve to inform this debate.

because they knew Dunn was prohibited from carrying them.[19]  Moreover, the police error (relying on a clearly defective warrant) thought to be so obvious was, in fact, not so obvious.

Dunn's written motion to suppress made an argument about the warrant authorizing a search for all weapons when the murder weapon was clearly a knife.  *See supra* at 6-7.  Only at argument on the motion did Dunn argue overbreath more generally and then without much enthusiasm.  The district judge seems to have taken it as only a *pro-forma* argument; he didn't even mention it in his oral decision.  The "including but not limited to" argument, in its present form and intensity, came into full bloom only in Dunn's arguments on appeal.[20]  With the luxury of time, briefs of counsel, assistance of law clerks and a retrospective view of things, it is easy for judges, in the comfort of their offices, to pontificate about officer errors, but most of the individuals involved in the case (officers, attorneys, and judges alike) did not recognize, at least at first blush, the particularity problem or consider it important.

Perhaps the police ought not be permitted to <u>willfully and with deviant purpose</u> take advantage of a judicial error, but nothing in this case suggests that to be the problem here.  Clearly, these officers are not constitutional scholars, but their only <u>willful</u> mistake was asking for too much from the state judge.  We blame trained, but not law-trained,

---

[19] While the government may have abandoned the severability argument, *see supra* n.12, the scope of the search is an important factor in deciding good faith.  *See United States v. Otero*, 563 F.3d 1127, 1134 (10th Cir. 2009); *United States v. Riccardi*, 405 F.3d 852, 864 (10th Cir. 2005).

[20] Dunn made enough of an argument in the district court to avoid waiver, but that should be cold comfort.

officers for not recognizing a judicial error committed by a law-trained judge. Perhaps the end justifies the means, but for me the logic is wanting. Judges claim to be the guardians of the Constitution. With respect to the Fourth Amendment, judges have said investigatory zeal ought be tempered by the constraining hand of a neutral and detached magistrate—the reason obtaining a warrant is preferable to a warrantless search. But when the rubber hits the road and a judge screws up only the police are ultimately and publically held accountable.[21] To the eye of an unschooled, but observant, wag that may appear to be unfair, even sardonically humorous. It may also conjure up a disturbing thought: "Zeitgeist rides tonight, and the devil take the hindmost!" Philip José Farmer, *Riders of the Purple Wage* (1967).

I am solely responsible for the delay in deciding this case.

---

[21] Since judicial immunity shields judges from liability for such mistakes, a sceptic might say the oversight requirement imposed on officers serves mostly to supply an alternate deep pocket for civil litigants claiming injury from constitutional violations. *See*, *e.g.*, *Poolaw v. Mercantel*, 565 F.3d 721 (10th Cir. 2009). While that may not be the most pressing purpose, or even an intended one, it may well be a collateral consequence. Unintended consequences are always in the mix; another lurks. Requiring the police to self-censor warrant requests in order to avoid responsibility for judicial errors may stifle, rather than merely constrain, investigatory zeal. It may also cause some to conclude the accountability calculus favors warrantless searches.